**CHEMICAL BANK & TRUST CO. et al. v. EARLY.**

Civil Action No. 105.

District Court, E. D. Virginia, at Alexandria.

June 14, 1946.

Eugene Untermyer, of New York City, Edgar J. Goodrich, of Washington, D. C., and Armistead L. Boothe, of Alexandria, Va., for plaintiffs.

Sewall Key, Acting Asst. Atty. Gen., James P. Garland, Sp. Asst. to Atty. Gen., and George R. Humrickhouse, Asst. U. S. Atty., of Richmond, Va., for defendant.

BARKSDALE, District Judge.

This action having been tried upon the facts by the court without a jury, the court does hereby find the facts specially and state separately its conclusions of law thereon, and directs the entry of the appropriate judgment, pursuant to Rule 52(a) of the Federal Rules of Civil Procedure, 28 U.S.C.A. following section 723c, as follows:

Findings of Fact as to the First Count.

1. At all the times herein material, plaintiff Chemical Bank & Trust Company, formerly known as The Chemical National Bank of New York (herein called "Chemical"), was and now is a corporation duly organized and existing under the laws of the State of New York, with principal office and place of business at 165 Broadway, Borough of Manhattan, City and State of New York, with power to accept and administer trusts of real and personal property and to administer estates as executor and trustee, and is a citizen and resident of the State of New York. The corporate name of said plaintiff was changed from said The Chemical National Bank of New York to Chemical Bank & Trust Company on or about May 28, 1929.

2. Plaintiff Laurence A. Steinhardt (herein called "Steinhardt") is and has been at all times a citizen of the United States, and was when the complaint was filed temporarily sojourning at Ankara, Turkey, as United States Ambassador to that Republic.

3. Plaintiff Helen R. Cutting (herein sometimes called "Widow") was born prior to September 28, 1927, has been at all times a citizen of the United States and at all times since in or about the year 1935 a resident and citizen of the State of Virginia, residing in Fauquier County in that State, and intermarried with John Arthur Hinckley, Jr., now deceased (herein called "Decedent") in the year 1930.

4. The defendant is now and has been at all times since September 15, 1942, and was prior thereto the duly appointed, qualified and acting United States Collector of Internal Revenue for the Collection District of Virginia

5. This suit and the causes of action herein set forth arise under the Constitution of the United States of America and the laws thereof providing for internal revenue, and this suit is brought to recover Federal Estate Taxes that were paid by the plaintiffs to the defendant and that were demanded, collected, and received by the defendant, in his official capacity as Collector of Internal Revenue for the Collection District of Virginia.

6. Said Decedent, John Arthur Hinckley, Jr., was at all times an American citizen and departed this life on February 16, 1940, a resident of Fauquier County, Virginia, leaving a last will and testament dated October 24, 1938 (herein called "Decedent's Will").

7. Decedent's Will was duly admitted to probate by the Surrogate's Court of the County of New York, State of New York,

where Decedent owned substantial intangible personalty and interests therein, and also undivided interests in real estate, on May 13, 1940, and letters testamentary thereunder were issued on May 14, 1940, by said Surrogate's Court to plaintiffs Chemical and Steinhardt as executors thereunder, and the New York executors duly qualified and have at all times since and are now acting as said executors in the administration of Decedent's estate. On June 7, 1940, Decedent's Will was also admitted to probate by the Circuit Court of the County of Fauquier, State of Virginia, where he resided at the time of his death and where he left real estate and personal effects, and letters testamentary thereunder were issued to plaintiff Steinhardt as executor, and letters of administration with the will annexed to said Widow, plaintiff Helen R. Cutting (then Helen R. Hinckley), by said Circuit Court on June 7, 1940; and said persons duly qualified and have continued to act as such executor and administratrix c. t. a. in the State of Virginia.

8. On or about the 13th day of May, 1941, the plaintiffs as executors duly filed with the Collector of Internal Revenue for the Collection District of Virginia at Richmond, Virginia, the Federal Estate Tax Return for Decedent's estate and paid to the Collector the sum of $243,976.39 as reflected by said return.

9. Said return was prepared and said Federal Estate Tax was paid on the basis of values of one year after the date of Decedent's death, and said date one year after Decedent's death is herein called "Optional Date."

10. Thereafter, on audit of said return, defendant determined a deficiency in federal estate tax of $161,469.62, and said sum, together with interest thereon of $13,-050.18, was paid by the plaintiffs to the defendant as such Collector on or about September 19, 1942.

11. Plaintiff Helen R. Cutting intermarried with George Cutting on September 13, 1944, and at all times prior thereto since her marriage to the Decedent, was Helen R. Hinckley hereinbefore mentioned and described as the "Widow."

12. Decedent was born on September 23, 1906, and on attaining the age of twenty-one years he became entitled to a substantial fund or sum of money, in excess of $800,000 that had been accumulated for his benefit under the will of his father, John Arthur Hinckley, Sr. (herein called "Senior"), who died August 31, 1910, leaving a last will and testament dated October 12, 1906 (herein called "Senior's Will").

13. Senior's Will was duly admitted to probate in the Surrogate's Court of the County of New York on September 29, 1910, and letters testamentary were issued thereunder by said Court to Senior's Widow, Mary Beach Hinckley (who has since remarried and is now Mary Bergamini and is herein sometimes called "Mother"), and Central Trust Company of New York (now Central Hanover Bank and Trust Company and herein called "Central") as executor thereunder on September 29, 1910.

14. At all the times herein mentioned, Central and its predecessors were duly authorized to accept and administer trusts of real and personal property under the wills of decedents, and its principal office and place of business is now at 70 Broadway, in the Borough of Manhattan, City of New York, and at all the times herein material said Mother, Mary Bergamini, has resided, and she resided when the complaint was filed, at 1105 Park Avenue, Borough of Manhattan, City and State of New York.

15. On or about the 28th day of September, 1927, and directly after he became entitled to ownership and possession of said fund so accumulated for his benefit under the Will of Senior, Decedent made and executed and delivered to said Chemical and said Steinhardt, as Trustees, in the City and State of New York, an agreement or indenture of trust in and by which Decedent, as settlor thereunder, then and there irrevocably paid, assigned, transferred and set over to said Living Trustees, and subject in all respects to the conditions and provisions of said agreement, certain securities and cash of a then market value of $780,000 as shown in Schedule "A" annexed to said instrument. Said agreement or indenture of trust is herein sometimes called the "1927 Trust" or "Living Trust,"

534

and said trustees thereunder are herein sometimes called the "1927 Trustees" or "Living Trustees."

16. Thereafter and from time to time, pursuant to the right of said settlor to add to and increase said Living Trust, Decedent irrevocably paid, transferred, assigned and set over to the Living Trustees additional securities and cash owned by him and derived from Senior's estate on the dates and in the amounts and of the then values which are listed as follows:

| | | |
|---|---|---|
| 1928: July 10: Cash | | $ 12,000.00 |
| 1929: Sept. 25: 5 shs. Hartford Fire Ins. Co. Cap. | | 5,300.00 |
| 1930: Oct. 14: 116 shs. Chemical Bank & Trust Co. Cap. | | 6,844.00 |
| Cash | | 18,156.00 |
| 1931: Oct. 20: $24,000. U. S. of America Treasury 3-3/8s 1943 | | 23,580.00 |
| 1932: Oct. 14: Cash | | 30,000.00 |
| 1933: Oct. 20: Cash | | 28,000.00 |
| 1936: Apr. 16: $7,000. Commonwealth of Australia 5s 1957 | | 7,385.00 |
| Cash | | 50,945.12 |
| 1939: June 2: $25,000. U. S. of America Treasury 2-3/4s 1954 | | 27,328.13 |
| Total | | $209,538.25. |

and the Living Trustees have at all times since the creation of said Living Trust continued to act as such trustees and have administered and turned to account the funds and assets thereof pursuant to its provisions.

17. The capital of the Living Trust was of a fair market value on the Optional Date of $742,088.50, before making provision for certain deductions claimed by the Third Count of the complaint.

18. Decedent left him surviving as his sole heirs and next of kin his Widow, Helen R. Hinckley (now plaintiff Helen R. Cutting), and a son, John Hinckley, who was born on February 11, 1932, and resides with plaintiff, Helen R. Cutting, in Fauquier County, State of Virginia, and is herein sometimes called "Infant."

19. Said Living Trust provided among other matters that the Living Trustees should administer and turn to account the properties thereof as follows:

"FIRST: To hold, manage, buy, sell, invest and reinvest said securities, mortgages and cash, or the proceeds thereof, the same and every part thereof, in the manner and in the class of securities hereinafter specified, and to collect, recover and receive the rents, issues, interest, income, dividends and profits thereof, hereinafter called 'income', and after deducting the proper and necessary expenses in connection with the administration of the trust, to pay the net income in quarterly installments of equal amounts, or as nearly equal as possible, unto the Settlor during the term of his natural life.

"SECOND: Upon the death of the Settlor, should he be survived by a widow by a valid marriage, and one or more legitimate descendants:

"(a) Should such widow be a person now in being, to pay one-half the income of this trust in quarterly installments to such widow during her life and upon her death to pay over one-half of the principal thereof to the descendants of the Settlor equally per stirpes and not per capita unless the Settlor shall otherwise direct and appoint by his Last Will and Testament, the right to dispose of this portion of this trust being hereby specifically reserved to him.

"(b) Should such widow be a person not now in being, to pay over one-half of the principal of this trust to such widow unless the Settlor shall otherwise direct and appoint by his Last Will and Testament, the right to dispose of this portion of this trust being hereby specifically reserved to him.

"(c) To pay the other one-half of the income of this trust in quarterly installments equally to such descendants per stirpes and not per capita until each attains his or her majority, at which time or times his or her proportionate share of one-half of the principal of this trust shall be paid over to such descendant.

"In the event the Settlor shall leave him a legitimate child or children or issue of a deceased child or children surviving, but no widow shall survive the Settlor, then and in such event the entire income thereof shall enure to the use and benefit of said child or children, or issue of a deceased child or children, share and share alike, per stirpes and not per capita, subject to all of the terms and provisions of this paragraph hereinbefore set forth. Should any such child of the Settlor die before attaining the age of twenty-one years leaving him or her issue surviving, such issue shall take share and share alike, per stirpes and not per capita, such part of the corpus of this trust as his or her parent would take if living.

"The Trustees within their discretion hereby vested in them shall not be obliged to deliver the share of any minor entitled to share in the distribution of principal hereunder until such minor shall have attained the age of twenty-one years, but the Trustees in their discretion may apply to the use of any such minor so much of the share of the principal to which such minor is entitled or of the income thereof, as the Trustees may deem necessary or proper for the education and support of such minor.

"The Trustees may make payment of any income or principal applicable to the use of a minor by making such payment, in their discretion, either to the parent or guardian of such minor or by applying the same for the benefit of such minor, and the receipt of such parent or guardian, or of such minor or evidence of the expenditure of such money for the benefit of such minor shall be a full and sufficient discharge to the Trustees of any such payment or payments. During the minority of any beneficiary entitled to income hereunder, the Trustees may accumulate for the benefit of such minor so much of the income applicable to his or her use as the Trustees, in their absolute and uncontrolled discretion, may deem necessary for the proper education and support of such minor.

"THIRD: Upon the death of the Settlor should he be survived by a widow by a valid marriage but no descendants:

"(a) To pay one-half the income from this trust in equal quarterly installments to MARY BEACH HINCKLEY during her life and upon her death to pay over the principal to the widow, unless the Settlor shall otherwise direct and appoint by his Last Will and Testament, the right to dispose of this portion of this trust being hereby specifically reserved to him.

"(b) Should such widow by a valid marriage be a person not now in being, to pay over to her the balance of the principal of this trust unless the Settlor shall otherwise direct and appoint by his Last Will and Testament, the right to dispose of this portion of this trust being hereby specifically reserved to him.

"(c) Should such widow by a valid marriage be a person now in being, to pay to her the balance of the income from this trust in quarterly installments during her life and upon her death to pay over the principal thereof to the Settlor's mother, if living, otherwise to the persons according to the laws of the State of New York governing the distribution of personal property who would then constitute the next of kin of the Settlor had the Settlor died at that time intestate owning such property, unless the Settlor shall otherwise direct and appoint by his Last Will and Testament, the right to dispose of this portion of this trust being hereby specifically reserved to him."

20. Decedent left him surviving a widow by a valid marriage who was a person in being on September 28, 1927, and a legitimate descendant, to-wit, said infant John Hinckley, and his Mother, now Mary Bergamini, and grandmother, Josephine Wood, also survived him.

21. Said Decedent duly exercised the power of appointment by his last will and testament over the one-half of said trust fund mentioned and described in Subdivision (a) of Paragraph Second, which was of the value on the Optional Date of $371,044.25, before provision for the claimed deductions previously mentioned in Finding 17 of this First Count. Said one-half or moiety of the fund (herein called "Appointed Share") was duly reported as taxable in said Estate Tax Return and the

amount of tax paid on or about May 13, 1941, as set forth in Finding 8, was predicated upon the inclusion of the Appointed Share as part of Decedent's taxable estate.

22. The Circuit Court of the County of Fauquier, Virginia, where Decedent resided at the time of his death, in an equity suit entitled "Helen R. Hinckley et als, Plaintiffs, vs. Mary Bergamini et als, Defendants," in which all of the interested parties, including the Infant, appeared by counsel, and in which said Infant was represented by a guardian ad litem, rendered its decree on March 3, 1941, wherein a Compromise Agreement entered into by all the parties was ratified and confirmed, and the legal instruments involved, such as wills and trusts, were construed in accordance with the said Compromise Agreement, as fully appears from the said decree, a copy of which appears as "Exhibit 5" of Plaintiff's Complaint.

23. Decedent retained, under the provisions of the Living Trust indenture, a contingent power of testamentary appointment, that is, if Decedent had been survived by a widow by a valid marriage, but no descendants, he could have disposed of the one-half of the trust property of the Living Trust here in question by his last will and testament. Since the Decedent was survived by a legitimate descendant, the one-half of the trust property of the Living Trust, here in issue, passes to Decedent's descendant, termed in this action "Junior," if he attains twenty-one years. The property is to pass to Junior's issue, if any, if Junior dies prior to attaining the age of twenty-one years.

24. Decedent transferred in trust, on September 28, 1927, substantially all of the property, to the possession of which he was then entitled, from the estate of his deceased father, termed herein "Senior." However, Decedent's share of the Large Trust established by his father, and not included in the Living Trust established by Decedent, was of greater value than the Living Trust established by Decedent on September 28, 1927. Decedent was the absolute owner of this share and entitled to collect the income therefrom, only the possession of the corpus of this share being postponed.

25. From time to time, Decedent transferred to the Living Trust additional property received from the Large Trust, as appears in Finding No. 16 of this First Count, and on June 2, 1939, property of the value of $27,328.13 on that date, was transferred by the Decedent to the Living Trust within two years of the date of Decedent's death, which occurred on February 18, 1940. The transfers to the Living Trust made after March 3, 1931, constituted transfers in trust where Decedent retained for his life the income from the property.

26. The value of the so-called Infant's share here in controversy, on the Optional Date, before provision for the claimed deductions mentioned in Finding 17 of this First Count, was $371,044.25.

27. By the provisions of Senior's Will, Senior disposed of two-thirds of his residuary estate for the benefit of his son, the Decedent herein, and said fund is herein called the "Large Trust."

28. The nature and effect of the provision for the benefit of Decedent in the Large Trust was determined by a judgment of the Supreme Court of the State of New York for the County of New York, dated January 30, 1912.

29. It was thereby adjudged, among other matters, that upon Senior's death his son, the Decedent, became absolutely vested with two-thirds of Senior's residuary estate, which is the Large Trust, and that he was the absolute owner of such share, but that full possession thereof was postponed as directed by Senior's Will, so that Decedent should receive out of the corpus of the Large Trust, the sum of $50,000, upon attaining the age of twenty-eight (which sum was paid over to him), one-half of the then remaining corpus on reaching the age of thirty-five, and the balance of the corpus upon reaching the age of forty, and that in the interim the entire income from the Large Trust should be paid to the Decedent.

30. No part of the corpus of the Large Trust, except $50,000, was paid to the Decedent, as he died before attaining the age of thirty-five years.

31. Exclusive of accumulated income and cash balance of income on hand in the Large Trust when the Decedent attained

majority, the corpus of the Large Trust was of the value on September 23, 1937, which was Decedent's twenty-first birthday, of $1,228,712.91.

32. The aggregate of accumulations, being $763,593.69, and of income on hand, being $45,248.36, for Decedent's benefit from the Large Trust when he so attained his twenty-first birthday, was $808,842.06, all of which was paid over to him at or about said date pursuant to the provisions of said judgment, Exhibit 7, under the laws of the State of New York.

33. The initial corpus of the Living Trust consisted of $780,000 of the cash and securities so paid over to Decedent on attaining majority, and the properties so transferred to the Living Trustees were considerably less than one-half of the funds and securities then held for the benefit of the Decedent.

34. The remaining funds, by the terms of Senior's Will, would ultimately be paid over absolutely to the Decedent as his own individual property should he attain forty years of age.

35. For some years before he attained his majority, Decedent had evinced a strong tendency towards and had indulged in lavish and free spending of money, along with an attitude of carelessness about money, and his lack of appreciation of the value of money was becoming of increasing concern to his Mother as he approached his majority.

36. For a period of more than a year before Decedent attained his majority, his said Mother, then Mary Hinckley, discussed frequently with her son, the Decedent, and they consulted also with their personal legal advisor, Mr. Lawrence A. Steinhardt, as to some method of conserving the substantial fund he would inherit absolutely on attaining majority, so that Decedent would be assured of a substantial income from an established fund during his life without requiring him to expend the fund itself.

37. Decedent enjoyed good health throughout his life. Except for a tonsillectomy when about sixteen years old, an appendectomy when about twenty-two years old, and a broken shoulder later sustained in a riding accident, he never had need of serious medical or surgical attention. He was vigorous physically, interested and occupied in hunting, riding, and other sports. He was by nature an extravert and was always eager for the company of and interested in his many friends and acquaintances and in their activities. He never indicated by any word or action that he gave thought to his death. He was consistently making plans for the future, such as development of his farm, and trips and cruises to be taken. A physical examination given him a few days after he created the Living Trust (at a time he complained of an ingrown toenail), when he received a commission in the Officers Reserve Corps, and when he took out life insurance, and at other times by his personal physician, revealed no indication of any organic disorder or illness. Decedent at no time anticipated his early death which occurred very suddenly from a heart attack while on a cruise to Puerto Rico.

38. Decedent created the Living Trust for the purpose of conserving the capital of the funds transferred to the Living Trustees so that it would be forever beyond his control, and the trust was not created nor were the transfers made by him in contemplation of death.

39. At the several times the Decedent transferred to the Living Trustees under said Living Trust, the additional cash and securities shown in Finding 16 of this First Count, Decedent made such transfers for the purpose of conserving the capital thereof under the terms of the Living Trust so that they would be forever beyond his control and none of such transfers were made by him in contemplation of death.

40. In creating the Living Trust in 1927, Decedent, although not acting in contemplation of death, did make a transfer by trust intended to take effect in possession or enjoyment at or after his death.

41. Of the eight additions made to the Living Trust after 1927, five (herein called "Post-Hope" transfers) were transferred to the Living Trustees after March 3, 1931, and the aggregate inventory value thereof

538

at the times of their respective transfers was $167,238.25.

42. The percentage that the value on the Optional Date of all the cash, securities and other properties contained in the Living Trust at Decedent's death bears to the aggregate inventory value of all of the transfers made by Decedent to the Living Trustees during his lifetime, is 75.0945%, and on said basis of computation, the value of the Post-Hope transfers in the Living Trust at the time of his death that is attributable to the one-half share of the Living Trust here in controversy, is $62,793.37 on the Optional Date.

43. Through an alternative method, and by tracing the Post-Hope transfers through the proceeds of their investment and reinvestment as contained in the Living Trust at the date of Decedent's death, the value on the Optional Date thereof is $165,412.98, and such optional value of the one-half share thereof here in controversy is $82,706.49.

44. On or about the 15th day of October, 1942, plaintiffs duly filed with the defendant herein their claim for refund for $174,519.80.

45. On or about the 20th day of September, 1944, plaintiffs duly filed with the defendant herein their amended claim for refund for $174,519.80.

46. The 1927 Trust was executed and delivered in the State of New York, said trust and the trust estate thereunder have at all times been administered in said State, and its interpretation and the devolution of the trust estate thereunder are governed by the laws of the State of New York.

47. More than six months and less than two years have elapsed since the filing of the original claim for refund or the amended claim for refund, but neither the defendant nor the Commissioner of Internal Revenue has rejected said claim or any part thereof or otherwise acted thereon, except to the extent that the Bureau Letter issued from the Internal Revenue Agent in Charge at Richmond, Virginia, under date of January 14, 1943, by which additional deductions from the taxable estate aggregating $5,642.52 were allowed, may be deemed to be action on the claim.

Special Finding of Fact Applicable to the First Count and All Other Counts of Plaintiffs' Complaint.

No part of the estate tax set forth in the refund claim or amended refund claim, or prayed for by the complaint herein, has been paid to the plaintiffs or otherwise received by them.

Conclusions of Law as to the First Count. Discussion.

The determination of the issue presented by the First Count of the complaint requires a construction of Section 302(c) of the Revenue Act of 1926, 44 Stat. 9, as amended by the Joint Resolution of March 3, 1931, 46 Stat. 1516, 26 U.S.C.A. Int.Rev. Code, § 811(c), the pertinent portion of which is as follows:

"Sec. 302. The value of the gross estate of the decedent shall be determined by including the value at the time of his death of all property, real or personal, tangible or intangible, wherever situated—* * * (c) to the extent of any interest therein of which the decedent has at any time made a transfer, by trust or otherwise, in contemplation of or intended to take effect in possession or enjoyment at or after his death, * * * *"

I have found as a fact that the trust here in controversy was not created "in contemplation of * * * death," so the question for determination is whether or not the "transfer" of property therein provided for was "intended to take effect in possession or enjoyment at or after his death." As was said by Mr. Justice Frankfurter in Helvering v. Hallock, 309 U.S. 106, 110, 60 S.Ct. 444, 447, 84 L.Ed. 604, 125 A.L.R. 1368, the issue does not "turn on the unglossed text of § 302(c)." A number of pertinent decisions of the Supreme Court must be considered, including the following:

In the case of May v. Heiner, 281 U.S. 238, 50 S.Ct. 286, 74 L.Ed. 826, 67 A.L.R. 1244, Pauline May, wife of Barney May, conveyed to him and others, as trustees, certain property in trust to pay the net income to Barney May during his lifetime, and after his decease, to Pauline May during her lifetime, and after her decease, the net proceeds of the corpus to be distributed

equally among her four children, their distributees or appointees. The court held that the corpus of this trust was not includible in the gross estate for taxation of Mrs. May, since the inter vivos transaction was not made in contemplation of death, and was not testamentary in character, was beyond recall by the decedent, and that at her death no interest in the trust property passed from her to the living, since title thereto had been definitely fixed by the trust deed.

So far as the facts appear from the opinion, it is to be noted that there was no reservation here of power in the grantor to dispose of the corpus by will or appointment in the event all her children predeceased her without making any appointment. Neither is there any provision for the reversion of the corpus to the grantor in the event her husband and the children should predecease the grantor. The trust instrument, in the instant case, is quite different in its provisions in that it provides that should the grantor be survived by "no descendants" (which, of course, would include the situation where a son was born, but predeceased the grantor), the grantor specifically reserves to himself the right to dispose of this portion of the trust. The statement of facts in the opinion is not sufficient for me to determine whether this case is distinguished from the instant case or not, but certainly this case tends to support plaintiffs' contention.

In the later case of Helvering v. St. Louis, etc., 296 U.S. 39, 56 S.Ct. 74, 77, 80 L.Ed. 29, 100 A.L.R. 1239, the court, citing May v. Heiner, supra, as one of the cases which "support our conclusion," considered a trust wherein the grantor conveyed certain property to be held by trustees, "the net income thereof to be paid to the decedent's daughter during her life, with remainder over to the persons named. The trustee was given discretionary power to terminate the trust whenever the trustee might deem it wise to do so, whereupon the estate was to revert to the grantor. The indenture contained a further provision that if the daughter predecease the grantor, the trust shall terminate and the trust estate be transferred, paid over, and delivered to the grantor, to be his absolutely."

Although, from the terms of this trust, it clearly appears that upon the happening of either one of two contingencies, the corpus of the trust estate would revert to the grantor, neither of the contingencies upon which the trust estate would revert to the grantor having taken place at the death of the grantor, the court held that the corpus of this trust was not taxable as a part of his gross estate, because the grantor, in executing the trust instrument, "parted with the title and all beneficial interest in the property, retaining no right with respect to it which would pass to anyone as a result of his death." The court distinguished Klein v. United States, 283 U.S. 231, 51 S.Ct. 398, 75 L.Ed. 996, relied upon by the Government.

In my opinion, this case definitely supports plaintiffs' contention here, but four justices dissented, and in his dissenting opinion Mr. Justice Stone asserts that Klein v. United States, supra, and supporting cases, should control, and said:

"It seems plain that the gift here was not complete until decedent's death. He did not desire to make a complete gift. He wished to keep the property for himself in case he survived his daughter. He kept his hold upon it by reserving from his gift an interest, terminable only at his death, by which full ownership would be restored to him if he survived his daughter. If he had reserved a power to revoke the trust, if he survived her, Reinecke v. Northern Trust Co., supra, 278 U.S. 339, 49 S.Ct. 123, 73 L.Ed. 410, 66 A.L.R. 397, would have made the gift taxable, as would Klein v. United States, supra, if he had reserved a remainder to himself with gift over, if he did not survive his daughter. Instead, by using a different form of words, he attained the same end and has escaped the tax.

"Having in mind the purpose of the statute and the breadth of its language it would seem to be of no consequence what particular conveyancers' device, what particular string, the decedent selected to hold in suspense the ultimate disposition of his property until the moment of his death. In determining whether a taxable transfer becomes complete only at death we look to substance, not to form. Klein v. United

States, supra, 283 U.S. at page 234, 51 S. Ct. 398, 75 L.Ed. 996; Chase National Bank of City of New York v. United States, 278 U.S. 327, 335, 49 S.Ct. 126, 73 L. Ed. 405, 63 A.L.R. 388; Reinecke v. Northern Trust Co., supra, 278 U.S. 339, at page 345, 49 S.Ct. 123, 73 L.Ed. 410, 66 A.L.R. 397; Saltonstall v. Saltonstall, 276 U.S. 260, 271, 48 S.Ct. 225, 72 L.Ed. 565. However we label the device it is but a means by which the gift is rendered incomplete until the donor's death. The extent to which it is incomplete marks the extent of the 'interest' passing at death, which the statute taxes."

When the court came to decide Helvering v. Hallock, 309 U.S. 106, 60 S.Ct. 444, 84 L.Ed. 604, 125 A.L.R. 1368, although the decision does not specifically overrule May v. Heiner, it would seem that the court did definitely overrule Helvering v. St. Louis, supra, which relied on May v. Heiner, and adopted the reasoning of the dissenting opinion as a basis of the decision of the Hallock case. The doctrine of the Hallock case seems to me to be that, no matter what particular conveyancers' device, or what particular string is used, if the decedent grantor in the trust instrument retained a valuable interest, even though it be contingent, and thus held in suspension the ultimate disposition of his property until the moment of his death, then the trust property would be included within the ambit of Section 302(c).

Following the Hallock case came the case of Fidelity-Philadelphia Trust Co. etc. v. Rothensies, Collector, etc., 324 U.S. 108, 65 S.Ct. 508, 89 L.Ed. 783, 159 A.L.R. 227, and its companion case, Commissioner etc. v. Field, 324 U.S. 113, 65 S.Ct. 511, 89 L. Ed. 786, 159 A.L.R. 230. It seems to me clear that these two cases follow and amplify the doctrine of the Hallock case, and definitely depart from the doctrine of the Helvering v. St. Louis case, supra.

Considered along with the Hallock case, it seems to me that the Fidelity Company case controls the decision of the instant case. The factual situations presented are quite similar. In the Fidelity case, 324 U. S. at page 111, 65 S.Ct. at page 510, 89 L. Ed. 783, 159 A.L.R. 227, the court said:

" * * * The taxable gross estate, in other words, must include those property interests the ultimate possession or enjoyment of which is held in suspense until the moment of the grantor's death or thereafter.

"Tested by that standard, the entire corpus of the trust should have been included in the decedent's gross estate and an estate tax levied on its net value at the date of decedent's death. The ultimate disposition of all the trust property was suspended during the life of the decedent. Only at or after her death was it certain whether the property would be distributed under the power of appointment or as provided in the trust instrument. The life estates of the daughters were contingent upon their surviving their mother and took effect in enjoyment only at the death of the latter. The remainder interests of the descendants of the daughters were contingent upon their surviving both the decedent and the daughters and took effect in possession only after the death of the decedent. Thus until the moment of her death or until an undetermined time thereafter the decedent held a string or contingent power of appointment over the total corpus of the trust. The retention of such a string, which might have resulted in altering completely the plan contemplated by the trust instrument for the transmission of decedent's property, subjected the value of the entire corpus to estate tax liability."

It seems to me that this reasoning fits the instant case like a glove. By the terms of the trust instrument here in controversy, if decedent's son had predeceased him leaving no descendants, the decedent would have had the power to dispose of this part of the trust estate by his will. In my opinion, that is the "particular string" of potential control, which brings the so-called Infant's Share of the trust in the instant case within the ambit of Section 302(c).

But plaintiff's contend that Goldstone v. United States, 325 U.S. 687, 65 S.Ct. 1323, 89 L.Ed. 1871, 159 A.L.R. 1330, requires me to determine the includibility of this portion of the trust estate in decedent's taxable estate, upon the facts existing at the time of

decedent's death; that is, plaintiffs contend that, inasmuch as the decedent's son survived him, decedent did not, at the time of his death, have any power or control over this trust estate, and therefore the doctrine of the Hallock case and the Fidelity Company case should not apply, and plaintiffs rely on certain language in the opinion on page 693 of 325 U.S., on page 1326 of 65 S.Ct., 89 L.Ed. 1871, 159 A.L.R. 1330, which, considered in the abstract, gives color to this contention. However, in my opinion, this language, considered along with the context, gives no support to plaintiffs' contention. It seems to me that the real holding of the Goldstone case is in accordance with the doctrine of the Hallock and Fidelity-Philadelphia Trust Company cases. In the Goldstone case, insurance contracts were involved, but the applicable principles were the same as those applicable to inter vivos trusts. By the terms of the insurance contracts, purchased by the husband decedent, the wife had the unrestricted right to assign them, borrow money on them, to receive dividends, to change the beneficiaries, and to surrender the contracts and obtain the surrender values thereof. Thus, the wife had unrestricted control, including the right to terminate the contracts and obtain the surrender values thereof. However, the contracts further provided that, should the wife predecease the decedent, then all the powers given to the wife were then to vest in the decedent to the extent that such powers had not otherwise been exercised by the wife. The wife exercised none of these powers prior to decedent's death. The court held that the decedent reversionary interest in the contracts in the event his wife should predecease him, constituted the "string" of control retained by the husband, saying:

" * * * The string that the decedent retained over the proceeds of the contracts until the moment of his death was no less real or significant because of the wife's unused power to sever it at any time.

"The essential element in this case, therefore, is the decedent's possession of a reversionary interest at the time of his death, delaying until then the determination of the ultimate possession or enjoyment of the property. The existence of such an interest constitutes an important incident of ownership sufficient by itself to support the imposition of the estate tax. Helvering v. Hallock, supra. The indefeasibility of that interest prior to death or the decedent's possession of other powers of ownership is unnecessary and indecisive of estate tax liability."

It is true that on the following page (325 U.S. at page 693, 65 S.Ct. at page 1326, 89 L.Ed. 1871, 159 A.L.R. 1330) the court said:

" * * * But the imposition and computation of the estate tax are based upon the interests in actual existence at the time of the decedent's death. It follows that only those events that actually occurred prior to that moment can be considered in determining the existence and value of the taxable interests. *Events that might have but failed to take place so as to erase a decedent's reversionary interest must be ignored;* such unrealized possibilities, if significant at all, only add to the remoteness of the reversionary interest." (Italics mine.)

The italicized sentence, as well as the context, demonstrate that this statement was with reference to the power which the wife there had, of terminating the contract—severing the string—and thereby completely destroying the Decedent's contingent reversionary interest. If the wife, during decedent's lifetime, had elected to obtain the cash surrender values of the contracts, all the transactions relating to these insurance contracts would have been inter vivos and there would have been no occasion for the application of 302(c).

In short, I conclude that the Goldstone case takes nothing away from the doctrine of the Hallock and Fidelity Trust cases, and applying the doctrine of these cases to the instant case, it seems clear to me that Decedent did have a string of control attached to the corpus of this trust estate, right up to the moment of his death, which would have enabled him to dispose of this corpus by his will had his son predeceased him leaving no descendants.

But plaintiffs also contend that even if Decedent, in the Living Trust in-

542

denture, at the time of its execution, reserved for himself in the Third Article thereof, a string of potential control over that part of the trust property here in controversy, this string of control was severed by the event of the birth of Decedent's son, and that thereafter Decedent had no possible or potential control and that therefore this portion of the trust property is not includible under the doctrine of the dictum of the Goldstone case. Assuming that there was a string of potential control provided for in the trust instrument, I think it must be conceded that if some event occurred which completely severed this string by virtue of the provisions of the trust instrument, then the trust property would not be includible. It seems to me that this result follows from the dictum of the Goldstone case, which dictum, it seems to me, is and ought to be the law.

To support this contention plaintiffs rely upon (1) the Virginia decree which, the plaintiffs contend, adjudicated that the Infant had a vested interest immediately upon his birth which could not be divested under any circumstances, and (2) the substantive law of New York, which, the plaintiffs contend, permits of no other conclusion than to require final vesting in the Infant of that share of the trust property here in controversy immediately upon his birth. Plaintiffs contend that, by reason of both the Virginia decree and the New York law, at the moment of the Infant's birth the remainder which had theretofore been contingent immediately became vested in the Infant and that this vesting completely severed Decedent's potential string of control.

With this contention, I cannot agree. In the consideration of this contention, the suggestion of the Hallock case, that "niceties of the art of conveyancing" should not be the court's "touchstone," that substance should be looked to rather than form, should be borne in mind. But I am of the opinion that no matter how this trust indenture is looked at, it is impossible to escape the conclusion that, by its plain provisions, Decedent retained in himself the potential power of testamentary disposition of that part of the trust property here

in controversy, right up until the moment of his death.

I am unable to give to the Virginia decree the conclusive effect contended for by the plaintiffs. It is true that by Paragraph 4 of the decree it is recited:

"That Decedent did not have and has not exercised any power over either the principal or the income of the remaining one-half of the fund held under the 1927 Trust (such remaining one-half being hereinafter called the Infant's Share) and the Infant is absolutely vested with and the absolute owner of the Infant's Share * * *."

This language is ambiguous to me. Certainly, Decedent did not have any power over this part of the trust during the Infant's lifetime. By the terms of the indenture, he was to have testamentary power over this portion of the trust property after the Infant's birth, only if the Infant predeceased him leaving no descendants. And *after Decedent's death,* to say that the Infant "is absolutely vested with and the absolute owner of the Infant's Share" is quite different from saying that *during Decedent's lifetime,* the Infant became absolutely vested with this trust property at his birth. But whatever these observations may be worth, the real consideration which impels me to disregard the Virginia decree is that a perusal of the whole decree makes it obvious that it is no more than the recital of a compromise entered into by the parties, rather than an adjudication in an adversary proceeding. And even if it were such an adjudication for the determination of the disposition of an estate, I do not believe that it would be binding upon this court in the determination of tax liability. Certainly, it is not res adjudicata as to either this defendant or the United States of America, neither of whom were parties to the suit

And even if a holding that this Infant took an absolutely vested estate in the remainder here in controversy at his birth can be derived from this decree, I am satisfied that the law of Virginia is contra. Under the provisions of this trust inden-

ture, the conclusion that the Infant's remainder was contingent until Decedent's death under Virginia law, seems to me to be clear from the following quotation from 1 Minor on Real Property 837, where the author in giving examples of contingent remainders, as distinguished from vested remainders, said:

"So, upon a conveyance or devise to A for life, remainder to his *unborn* son or child, or remainder to his eldest son (he having no son at the time), the remainder, being to a *person not in being,* is necessarily *contingent* until a son is born to A, when it immediately becomes vested. But if, in such case, the remainder were to the eldest son of A *living* at A's *death,* the remainder would be contingent until the death of A, for until that time it cannot be definitely known who will answer the description of the remainderman contained in the deed or will, if indeed there will be anyone to answer it, for the person who now answers the description of A's *eldest son* may die before A, and another or no other take his place.

"Perhaps the most frequently recurring instances of this class of contingent remainders are found in the case of remainders limited to the heirs, heirs of the body, issue, *descendants,* etc. [Italics mine] of a *living* person (it is otherwise if the person be *dead*), in which case the remaindermen cannot be ascertained till such person's death, for nemo est hares viventis,— no one can be the *heir* of a *living* person, and his *heirs of the body,* or *issue* or *descendants* (which in a *will* are equivalent to *heirs of the body*) are equally unascertainable during his lifetime. Such remainders are always *contingent* unless there be an intention to use the words referred to in some other than their technical sense * * *."

Nor do I find that the New York law supports plaintiffs' contention in this regard. The cases cited in Plaintiffs' Brief (pp. 28–32), in my opinion, fall far short of requiring the conclusion that the Infant here took an absolutely vested estate in this trust property at the time of his birth. In the cases cited in Plaintiffs' Brief, in no instance does there appear any such provision as appears in the trust indenture here, to the effect that should the settlor leave no descendants he retains the "right to dispose of this portion of this trust" by will.

A careful perusal of the New York cases leads me to the conclusion that the remainder here in controversy did not vest absolutely in the Infant at his birth; if at his birth there was any vesting at all, it was a vesting subject to be divested upon the happening of the contingency of his death before that of his father, the Decedent.

Besides, the plain language of the New York statute seems to me to require the conclusion that the Infant's remainder under this trust remained contingent until Decedent's death, at the earliest. Section 40 of the New York Real Property Law, Consol.Laws, c. 50 (Plaintiff's Brief, p. 27) is as follows:

*"When future estates are vested; when contingent.* A future estate is either vested or contingent. It is vested, when there is a person in being, who would have an immediate right to the possession of the property, on the determination of all the intermediate or precedent estates. It is contingent while *the person to whom* or the event on which it is limited to take effect remains uncertain." (Italics mine).

It seems to me obvious that "the person to whom" the remainder here in controversy should go, was, of necessity, uncertain until the death of Decedent. See also the quotation from ·Minor on Real Property, supra.

So it seems to me that, notwithstanding plaintiffs' contention, Decedent, at the time of the execution of this trust indenture and thereafter until the moment of his death, had and retained a string of potential control by testamentary disposition under the Third Article of the indenture over the trust property here in controversy.

Therefore, as set out in the following Conclusions of Law, I arrive at the conclusion that the entire one-half share of the property of the Living Trust here in controversy should be included in Dece-

dent's taxable estate, without reaching the questions of (1) whether that part of the trust property here in controversy is taxable because of the possibility of reverter alleged to be found in the "Fourth" paragraph of the trust instrument, or (2) whether the Post-Hope additions to the corpus are taxable even if the Pre-Hope fund should not be.

### Conclusions.

It follows, therefore, that my conclusions of law as to the First Count are that:

1. Neither the contemporaneous transfer of property under the Living Trust of 1927, nor the subsequent transfers of additional sums thereto, were made "in contemplation of * * * death" within the meaning of 26 U.S.C.A. Int.Rev. Code, § 811(c).

2. The said Living Trust created by Decedent in 1927 was irrevocable.

3. Decedent retained in the 1927 Living Trust indenture a contingent power of testamentary appointment as to the one-half of the trust property here in issue, making the contemporaneous transfer of property, and also the subsequent transfers of additional funds thereto, taxable under 26 U.S. C.A. Int.Rev.Code, § 811(c).

4. All of the transfers by Decedent to the 1927 Living Trust, both contemporaneous and subsequent, were intended by the Decedent to take effect in possession or enjoyment at or after his death, within the meaning of 26 U.S.C.A. Int.Rev.Code, § 811(c).

5. The entire one-half share of the property of the 1927 Living Trust here in controversy, was properly included in Decedent's taxable estate as a transfer or transfers intended to take effect in possession or enjoyment at or after death, within the meaning of 26 U.S.C.A. Int.Rev.Code, § 811(c).

6. The plaintiffs are not entitled to recover anything of the defendant upon their claim asserted in this count.

### Findings of Fact as to the Second Count.

1. The Large Trust as it existed at Decedent's death became part of Decedent's estate and was included in the estate tax return as concededly subject to the imposition of the Federal Estate Tax.

2. The remaining one-third of Senior's residuary estate was held on trust (herein called "Small Trust") to pay the income thereon to his widow, now Mary Bergamini and herein sometimes called "Mother," for life by a provision in his will reading as follows:

"2nd. I give and bequeath to my dear wife Mary Beach Hinckley during her natural life, the income of one third of my Estate both real and personal, after deducting certain legacies and bequests hereinafter mentioned: After her death I now direct that the aforementioned one-third of my estate so left her, be divided equally among such of my children as may survive her-And request and direct my Executors or Administrators or their assigns to pay to her yearly the income of such one third of my estate, at such times during each year as it may become due and payable."

3. Said provision contained in Paragraph 2nd of Senior's will was construed by the Surrogate's Court of New York County by an opinion of the Surrogate in a proceeding commenced by Senior's executors in the year 1939 to account for certain unadministered assets which had come into their hands, which limited the remainder interest in the Small Trust to a child or children of Senior to the exclusion of descendants in any other generation.

4. Senior's only child was the Decedent who was living at Senior's death, and since the Decedent died on February 16, 1940, predeceasing the Mother, then on the death of the Mother there could be no child of Senior to take the remainder of the Small Trust under the terms of Senior's Will. Therefore, Senior died intestate as to the remainder interest in the Small Trust, subject only to the life estate of the Mother.

5. The value of the remainder interest in two-thirds of the Small Trust on the Optional Date was $196,964.64.

6. Since Senior died intestate as to the Small Trust, and this Decedent was Senior's sole heir, this Decedent's estate was

entitled to two-thirds of the remainder interest in the Small Trust.

### Conclusions of Law as to the Second Count.

**1.** Decedent inherited from the estate of Senior as the sole heir, two-thirds of the remainder interest (being the interest included in Decedent's taxable estate) in the Small Trust.

2. The two-thirds of the remainder interest in the Small Trust constituted property of Decedent's estate, within the meaning of 26 U.S.C.A. Int.Rev.Code, § 811(c).

3. The undisputed value of two-thirds of the remainder interest in the Small Trust was properly included in Decedent's taxable estate.

4. The plaintiffs are not entitled to recover anything of the defendant upon their claim asserted in this count.

### Findings of Fact as to the Third Count.

1. Forthwith upon the death of Decedent and by reason thereof, it became necessary to administer the corpus of the 1927 Trust as therein provided and for that purpose to divide said fund into two equal shares or moieties respectively consisting of the Appointed Share and the so-called Infant's Share.

2. To enable such results to be brought about as required by law, it became necessary and incumbent upon the Living Trustees to institute an action in the Supreme Court of the State of New York to settle their accounts in the premises and to obtain the instructions of the Court, and in accordance therewith such proceedings were had as resulted in a judgment of said court dated June 30, 1942.

3. In connection with said action and the rendition of said decree, and to bring about the devolution of the Trust Estate pursuant to the terms of the instrument and also as to the Appointed Share to carry out the intention of the Testator-Decedent, certain fees, charges and disbursements were necessarily incurred by the Living Trustees that are correctly set forth in Exhibit 10 and that were directed to be paid by said decree, of which $4,630.04 was directed to be payable and was paid by the Living Trustees out of the capital of the Appointed Share, and $6,893.23 was directed to be payable and was paid by the Living Trustees out of the capital of the so-called Infant's Share.

4. The payments so made from the Appointed Share were claimed by plaintiffs but were not allowed as deductions by defendant in his determination of the value of the taxable estate, and the payments so made from the Infant's Share were not allowed as deductions by defendant in his determination of the value of the taxable estate.

5. The taxable value of the Appointed Share was diminished by said amount of $4,630.04 so paid.

6. The value of the so-called Infant's Share of the taxable estate herein was diminished by said amount of $6,893.23 so paid.

### Conclusions of Law as to the Third Count.

**1.** The payments made by the Living Trustees out of the 1927 Living Trust to the extent of $4,630.04 under the judgment of the Supreme Court of the State of New York dated June 30, 1942, diminished the taxable value of the Appointed Share to that extent.

2. Said payments of $4,630.04 are lawful deductions and should be deducted from the value of the Decedent's taxable estate.

3. The payments made by the Living Trustees out of the 1927 Living Trust to the extent of $6,893.23 under the judgment of the Supreme Court of the State of New York dated June 30, 1942, diminished the taxable value of the so-called Infant's Share here in controversy to that extent.

4. Said payments of $6,893.23 are lawful deductions and should be deducted from the value of the Decedent's taxable estate.

5. Plaintiffs are entitled to judgment against the defendant accordingly.

### Findings of Fact as to the Fourth Count.

1. Plaintiffs have expended and disbursed as necessary expenses of administration by the estate of said Decedent the

following sums of money for the following purposes:

| | |
|---|---|
| Special Guardian's fee........ | $2,000.00 |
| Cravath, deGersdorff, Swaine & Wood, counsel fees ........ | 1,200.00 |
| Ernst, Gale, Bernays & Falk, counsel fees .............. | 1,000.00 |
| Miscellaneous Administration Expenses $2,442.52 whereof there was allowed ........ 1,000.00 | |
| leaving a balance properly deductible of ................ | 1,442.52 |
| or a total sum of .......... | $5,642.52. |

2. The payments so made were claimed by plaintiffs but were not allowed as deductions by defendant in his determination of the value of the taxable estate except to the extent of the one thousand ($1,000.00) dollars already taken into the computation by the previous finding.

3. By Bureau Letter from the Office of the Internal Revenue Agent in Charge, Richmond, Virginia, dated January 14, 1943, said deductions were allowed under authority of Conference Report dated November 28, 1942, and the value of the taxable estate was diminished by said sum of $5,642.52 so paid.

Conclusions of Law as to the Fourth Count.

 1. The payments made by the plaintiffs out of the estate of Decedent as shown in Finding of Fact No. 1, as to this Fourth Count, and aggregating $5,646.52, were necessary and proper administration expenses of the Decedent's estate.

2. The taxable value of Decedent's estate was diminished by said payments of $5,642.52 and the amount of said payments should be deducted from the value of his taxable estate.

3. The plaintiffs are entitled to judgment against the defendant accordingly.

Findings of Fact as to the Fifth Count.

1. Since on or about September 15, 1942, and by reason of the defendant's determination that there was a deficiency in estate taxes due from the plaintiffs herein, the payment of the deficiency so claimed, and the filing of the claims for refund, plaintiffs instituted this suit and in connection with the factual and legal matters arising by reason of the controversy relating to the correct taxable estate of the Decedent and the amount of Federal Estate Tax that is lawfully due and payable by the plaintiffs to the defendant, plaintiffs have paid and incurred substantial sums of money by way of counsel fees, travelling expenses, attorneys' and clerical disbursements, accountants' fees, witness fees, and other costs and expenses in connection with the subject matter of this suit and the prosecution thereof.

2. Such fees and expenses so paid and incurred by the plaintiffs were and are necessary and proper expenses of administration of the estate of the Decedent.

3. As and for their counsel fees, plaintiffs have agreed to pay to such counsel the sum of eleven thousand, five hundred ($11,500) dollars, plus a sum measured by 12½ per cent. of the amount of recovery otherwise adjudicated in this suit, the aggregate of said fixed and contingent fees not however to exceed twenty-five thousand ($25,000) dollars, and the sums so payable are fair and reasonable considering the amount at issue, the complexity of the matters involved and the time and effort necessarily devoted by counsel to the subject matter of this suit, and the obligations so incurred by plaintiffs to their counsel are necessary expenses of administration of the Decedent's estate.

4. Plaintiffs have also paid and incurred as necessary expenses and disbursements of the instant litigation the following sums of money:

| | |
|---|---|
| Paid by Executors, Sept. 15, 1942 to Nov. 24, 1944............ | $ 488.32 |
| Open items, Guggenheimers & Untermyer books, Mar. 23, 1946 ....................... | 112.80 |
| Leslie Banks & Co., Accounting Services re Post-Hope Amendment Transfers ...... | 400.00 |
| Estimated travelling, hotel and other expenses re trial........ | 150.00 |
| | $1,151.12; |

all as necessary expenses of administration in Decedent's estate, and that have been paid or are due and payable by the plaintiffs from Decedent's estate.

5. No part of the said fees of counsel or of said disbursements and expenses in the instant suit have been allowed as deductions by defendants in the determination of the value of the taxable estate, and the value of the taxable estate is diminished by the amounts so due and payable.

Conclusions of Law as to Fifth Count.

1. Plaintiffs have paid or sustained the following necessary expenses of administration of the estate of the Decedent in the instant litigation:

(a) $11,500 for their attorneys fees payable in any event;

(b) $1,151.12 for their necessary expenses and disbursements; and

(c) As additional fees and compensation to their attorneys, 12½% of the amount that may be otherwise recovered in this suit provided that the total compensation so payable to such attorneys shall not exceed $25,000.

2. The amounts and sums of money specified and set forth in Conclusion of Law No. 1, as to this Fifth Count, are necessary and proper deductions from the Decedent's taxable estate, have been paid or are due and payable by said Estate, and the taxable estate is further diminished to that extent.

3. Plaintiffs are entitled to judgment against the defendant accordingly.

Special Conclusion of Law. Not Applicable to Any Particular Count.

The court declines to make any finding of fact upon the question of deductions claimed by the plaintiffs by reason of inheritance taxes paid or to be paid by them to the states of Virginia and New York, for the reason that the court concludes as a matter of law that it has no jurisdiction over such questions in that such questions or issues have not been presented to the defendant in any claim for refund, nor is any such question raised in plaintiffs' complaint herein.

Directions for Order.

The foregoing findings of fact and conclusions of law are this day filed and copies will be mailed to all counsel. An order, in conformity to these findings and conclusions, and preserving all exceptions desired by the parties, will be prepared by counsel and submitted to the court for entry.